UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RAYMOND AREL                  :
                                        :
     v.                      :      C.A. No. 05-492A
                                          :
JO ANNE B. BARNHART,          :
Commissioner of the Social Security  :
Administration                  :

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on November 28, 2005 seeking to reverse the decision of the Commissioner or, in the alternative, to remand for further proceedings. On January 29, 2007, Plaintiff filed a Motion for Summary Judgment. On March 30, 2007, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner.

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 12) be GRANTED and that Plaintiff's Motion for Summary Judgment (Document No. 10) be DENIED.

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB on January 24, 2002 alleging an inability to work since December 28, 1997 due to gout and arthritis. (Tr. 99-101, 108, 113).  The application was denied initially on April 26, 2002 (Tr. 41-44) and on reconsideration on June 27, 2002.  (Tr. 46-49). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 50).  The first hearing was continued to give Plaintiff an opportunity to submit additional medical evidence.  A second hearing was held on December 8, 2003, at which Plaintiff, represented by counsel, a medical expert and a vocational expert appeared and testified.  (Tr. 282-318).  ALJ Martha Bower issued a decision on March 2, 2004 finding that Plaintiff was not entitled to a period of disability or DIB, but the Appeals Council later vacated her decision and remanded the case for further administrative proceedings.  (Tr. 34-40).

A third hearing was held before ALJ Hugh Atkins on May 5, 2005 at which Plaintiff, represented by counsel, and a medical expert appeared and testified.  (Tr. 319-340).  After hearing and consideration of the testimony of Plaintiff, the ALJ decided that Plaintiff was not entitled to a period of disability or DIB because he was capable of performing other work which exists in significant numbers in the national economy prior to March 31, 2001, his date last insured, and was therefore not disabled as defined by the Act.  (Tr. 20-28).  On August 9, 2005, Plaintiff filed a request for review of the ALJ's decision.  (Tr. 16).  The Appeals Council denied Plaintiff's request for review on September 23, 2005, thus making the ALJ's July 22, 2005 decision the final decision of the Commissioner.  (Tr. 12-14).  Plaintiff thereafter filed a timely appeal with this Court.

## II.     THE PARTIES' POSITIONS

Plaintiff argues that ALJ Atkins' decision to deny him disability benefits is not supported by substantial evidence in the record.  Plaintiff also argues that ALJ Atkins failed to follow proper standards for pain evaluation.

The Commissioner disputes Plaintiff's claims and argues that the ALJ properly evaluated the credibility of Plaintiff's subjective complaints and that his nondisability finding is supported by substantial evidence.

## III.     THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law.  Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  Seavey, 276 F.3d at 8.  To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four remand may be appropriate to allow her to explain the basis for her decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken
> before the Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there is good
> cause for the failure to incorporate such evidence into the record in
> a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish: (1) that there is

new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there

is a reasonable possibility that it would change the administrative result; and (3) there is good cause

for failure to submit the evidence at the administrative level.  See Jackson v. Chater, 99 F.3d 1086,

1090-92 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the

Commissioner, if new, material evidence becomes available to the claimant.  Jackson, 99 F.3d at

1095.  With a sentence six remand, the parties must return to the court after remand to file modified

findings of fact.  Id.  The court retains jurisdiction pending remand, and does not enter a final

judgment until after the completion of remand proceedings.  Id.

## IV.    DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

claimant unable to do her previous work, or any other substantial gainful activity which exists in the

national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

A.      **Treating Physicians**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

### B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained. See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir.

1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  <u>Carrillo Marin v. Sec'y of Health and Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

### D.    The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five.  <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings

as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

### E.    Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that

significantly limits basic work skills.  <u>Nguyen</u>, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  <u>Heggarty</u>, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  <u>See</u> <u>Ferguson v. Schweiker</u>, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.      Pain

"Pain can constitute a significant non-exertional impairment."  <u>Nguyen</u>, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg, 26 F. Supp. 2d at 309.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### V.    APPLICATION AND ANALYSIS

Plaintiff has an eighth-grade education and worked in the construction industry as a painter and as a framer. (Tr. 114, 119). Plaintiff worked until January 15, 2001, after his alleged disability onset date of December 28, 1997, but Plaintiff's earnings during that time did not reach the substantial gainful activity level. (Tr. 21 at n.2, 108, 114, 128-130, 296, 324). Plaintiff testified that he is unable to work because every joint hurts and he is "in total pain, all the time." (Tr. 294). Plaintiff further testified that prior to his date last insured, his only source of treatment was through the hospital emergency room because he did not have medical insurance. (Tr. 288, 308).

On April 28, 1997, Plaintiff presented to the emergency room at Landmark Medical Center complaining of a swollen right knee and left great toe since April 24, 1997. (Tr. 187). Plaintiff's knee and toe were swollen and red upon examination, and Plaintiff was diagnosed with gout. (Tr. 188). Plaintiff was treated with Indocin and advised to decrease his alcohol consumption, limit seafood and organ meats and apply ice to the affected areas. (Tr. 187).

Plaintiff returned to the Landmark Medical Center emergency room over one year later on July 26, 1998, complaining about pain and swelling in his left elbow for the past three days. (Tr. 189-190). Plaintiff stated that he was diagnosed with gout one year ago and that he takes Indocin or Advil. (Tr. 190). He relayed that the gout was "getting better," but he wanted medication for his next attack and a "paper to take to court that says I have gout." Id. Examination revealed decreased range of motion of the left elbow and right knee with some swelling. Id. Plaintiff was diagnosed with gout and provided with a prescription for Indocin. (Tr. 189-190). Plaintiff was also diagnosed with alcohol abuse and advised to cut back on his alcohol consumption, follow-up with a primary care physician and consider taking preventative medication for his gout. Id.

Plaintiff next sought treatment for his gout on April 12, 1999, at the Landmark Medical Center emergency room. (Tr. 191-192). Plaintiff informed that it had been about nine or ten months since his last episode, but he was experiencing a flare up in the third finger of his right hand. (Tr. 192). Edema was noted on examination of the hand, and Plaintiff was given prescriptions for Indocin and Vicodin. (Tr. 191-192).

Seven months later, on November 15, 1999, Plaintiff returned to the Landmark Medical Center emergency room complaining of pain in both great toes, his left elbow and his right knee for the past week. (Tr. 193-194). Plaintiff was medicated with Toradol and was discharged home. (Tr. 194).

Plaintiff next presented to the emergency room on July 17, 2000, stating that he had gout with pain in his left elbow and both ankles. (Tr. 196). Plaintiff relayed that he had a history of gout for two years with intermittent flare-ups of his condition. He added that Indocin treated the condition with good effect, but that he had run out of medication. Plaintiff was provided a prescription and discharged. (Tr. 196).

On January 25, 2001, Plaintiff returned to the Landmark Medical Center emergency room stating that he had injured his left ankle two weeks prior, after slipping on ice, and he was experiencing pain in his left ankle and his lower left leg. (Tr. 144, 200). X-rays showed a trimalleolar fracture of his left ankle, and two screws were surgically implanted in the ankle on January 30, 2001. (Tr. 146-147). Two months later, on March 29, 2001, Plaintiff elected to have the two screws removed, as he was doing well. (Tr. 149-151). Plaintiff informed the attending physician, Dr. Jacques Bonnet-Eymard, that he had a history of gout, which he treated himself with

Indomethacin. (Tr. 144). Plaintiff also informed prior to both surgeries that he took only ibuprofen for medication.[1] (Tr. 144, 149).

After Plaintiff's visit to the emergency room in January 2001 when he fractured his ankle, he did not seek treatment for his gout at the emergency room, or any other medical facility, until December 11, 2001 when he presented to the emergency room complaining of pain in his wrist and left elbow. (Tr. 155). Plaintiff stated that he had run out of medication and that he wanted a prescription for Indocin. Id. Plaintiff was given a prescription and discharged. (Tr. 156).

Plaintiff sought treatment for his gout at the Landmark Medical Center emergency room on two occasions in 2002. On February 11, 2002, Plaintiff presented with complaints of swollen fingers and asked for a refill on his prescription for Indomethacin. (Tr. 201-202). Plaintiff was discharged with a prescription. (Tr. 202). Plaintiff visited the emergency room for the second time that year on March 26, 2002, when he complained of pain in his left knee, left foot and toes after running out of Indomethacin. (Tr. 204). Plaintiff was discharged with a prescription. Id.

On September 6, 2002, Plaintiff was examined by Dr. Waseem Khan, Director of the Arthritis Center at the Rehabilitation Hospital of Rhode Island, for an evaluation of his gout. (Tr. 177-178). Dr. Khan noted Plaintiff's reports of pain in his knees and ankles as well as intermittent arthralgias in his hands, elbows and shoulders for five years. (Tr. 177). He remarked that Plaintiff had never had an inflamed joint examined for crystals (a sign of gout), though his serum uric acid level was high. Id. Blood work also revealed Plaintiff's sedimentation rate as within the normal range with a negative rheumatoid factor. Id. On examination, Dr. Khan observed that Plaintiff had

---

[1] Although Plaintiff testified that he did not seek treatment for his gout on a regular basis because he did not have medical insurance, the hospital records from January 30, 2001 and March 29, 2001 indicate that Plaintiff was covered by Medicaid. (Tr. 143, 148).

a slightly antalgic gait, but there was no swelling or synovitis of the hands, wrists or elbows and he had full range of motion in both shoulders, hips and knees. (Tr. 177-178). Ankles were without swelling or synovitis, and there was no evidence of swelling or erythema of the toes. (Tr. 178). Dr. Khan opined that Plaintiff's elevated uric acid level, combined with his reports of frequent joint swelling, indicated the likely presence of gout. Dr. Khan suggested that Plaintiff would be a candidate for treatment with Allopurinol (a preventative gout medication), but he would refrain from using that medication until Plaintiff cut down on his "above average" alcohol intake. (Tr. 178).

At a follow-up visit on October 4, 2002, Dr. Khan noted that x-rays of Plaintiff's knees were unremarkable and foot films showed only mild degenerative changes in the first joints of the toes. (Tr. 180). Plaintiff complained of pain in both feet and ankles and stated that he had difficulty walking and climbing stairs, but there was no swelling or synovitis present on examination. Id. Hand grips were 5/5. Id. Dr. Khan diagnosed gout and suggested prophylactic therapy with Allopurinol, but he indicated that Plaintiff needed to reduce his alcohol intake to normalize liver function before starting this treatment, due to risk of hepatotoxicity. (Tr. 180).

Plaintiff did not follow up with Dr. Khan until June 10, 2003, after missing two appointments. (Tr. 184). Plaintiff presented with an antalgic gait and a small effusion in the left knee, but range of motion of both knees was more than 110 degrees, and no erythema or warmth was noted. Id. There was no swelling of the fingers, wrists or elbows. Id. X-rays revealed mild joint space narrowing in the media compartment of both knees and advanced osteoarthritis of the left ankle, posttraumatic. Id. Dr. Khan injected Plaintiff's left knee with Lidocaine, but he indicated that he did not feel comfortable prescribing Indomethacin given Plaintiff's excessive alcohol intake. Id. Dr. Khan noted that treatment with Allopurinol was not an option until Plaintiff reduced his

-15-

alcohol use, and he emphasized the importance of regular follow-up care with a primary care physician.  Id.

Plaintiff had a follow-up visit with Dr. Khan one month later on July 8, 2003.  (Tr. 185-186). Plaintiff stated that his left knee was "substantially better" after the Lidocaine injection the previous month, and he did not have any pain in his left knee on walking, though he continued to complain of pain in both feet due to plantar fasciitis.  (Tr. 185).  On examination, Dr. Khan observed that Plaintiff's gait was slightly antalgic, but he had full range of motion of both knees without swelling, erythema, warmth or instability.  There was no inflammation of the toes and no swelling of the hands, wrists or elbows.  Dr. Khan diagnosed bilateral plantar fasciitis and instructed Plaintiff to begin stretching exercises.  With regard to Plaintiff's gout, Dr. Khan instructed Plaintiff to start Allopurinol and further reduce his alcohol intake.  Id.

Dr. Thomas McGunigal performed a DDS consultative examination of Plaintiff on December 5, 2002.  (Tr. 181-183).  Plaintiff informed that he had joint pain primarily in the knees, ankles and feet for the past five years, which is aggravated by standing, walking and exercising.  (Tr. 181).  On examination, Dr. McGunigal noted no swelling or synovitis of the knees or ankles and straight-leg raising was negative bilaterally.  (Tr. 182).  Gait, tandem gait, toe walking and heel walking were normal, as was hopping on the right and left, bending, squatting and arising from a squat.  Plaintiff was able to transfer from sitting to standing without difficulty and he was able to get on and off the exam table in a normal fashion. X-rays of the right knee and right ankle were normal, films of both feet showed only mild degenerative narrowing of the first toe joint, x-rays of the left ankle revealed degenerative changes and views of the left knee showed a well-maintained joint space with no acute process.  (Tr. 183).  Dr. McGunigal opined that Plaintiff could sit for eight hours, stand for two

-16-

hours, walk for one hour and alternate sitting and standing for eight hours.  (Tr. 182).  Dr. McGunigal added that Plaintiff could lift up to one hundred pounds occasionally, use his lower limbs to operate controls, frequently bend and occasionally squat, kneel and crawl.  (Tr. 182).

Plaintiff sought treatment for his gout at the Landmark Medical Center emergency room on eight occasions between March and December 2003 and on five occasions in 2004.  (Tr. 205-233, 239-264).  Plaintiff complained of pain in his knees, both feet and both hands and typically reported that the pain had started a few days prior to his visit.  (Tr. 203, 208, 210, 215, 221, 229, 241, 251, 257, 264).  Plaintiff often stated that he had run out of Indocin and that he would like another prescription.  (Tr. 204, 206, 219, 223, 229, 258, 264).  Emergency room staff provided Plaintiff with a prescription for Indocin.  (Tr. 206, 214, 218, 225, 240, 246, 249, 254).

At the second administrative hearing on December 8, 2003, Dr. Stephen Kaplan, an internist and rheumatologist, testified as a medical expert.  (Tr. 302-315).  Dr. Kaplan testified that a diagnosis of acute gouty arthritis was reasonable based on the evidence of record and that such condition typically occurred in acute attacks, which always clear up in the first few years, though they worsen over time.  (Tr. 304-305, 309).  He explained that on average, it takes at least two or three years to develop the chronic disease, and the evidence suggested that Plaintiff was in the early stage of the condition.  (Tr. 307, 310).  Dr. Kaplan added that acute gouty arthritis is a treatable condition, and, in fact, it can be reversed with Allopurinol.  (Tr. 305-307).

Dr. Kaplan testified that although Plaintiff seemed to have one attack in 1997, one attack in 1998 and two attacks in 1999, the record did not show any chronic complaints until 2002.  (Tr. 310).  Plaintiff's sedimentation rate (which Dr. Kaplan explained, measures inflammation and is an indicator of arthritis) was normal in September 2002, which suggested that Plaintiff was not

experiencing a lot of discomfort or inflammation.  (Tr. 311).  Dr. Kaplan added that in the acute phase, the pain will come and go and likely will not occur every day.  (Tr. 312).

Dr. John Pella, an internist, testified as a medical expert at the third administrative hearing on May 5, 2005.  (Tr. 96, 335-340).  Based on the evidence, Dr. Pella stated that Plaintiff's gout appeared to start late in 1997 and 1998, and the initial episodes were sporadic and spaced widely apart.  (Tr. 336-337).  Dr. Pella added that he did not have the sense that Plaintiff's attacks were frequent prior to March 31, 2001, his date last insured.  (Tr. 337).  He stated that he did not have a sense that Plaintiff experienced marked chronicity until 2002 and 2003.  (Tr. 338).  Dr. Pella explained that not all attacks last for weeks, and some resolve fairly quickly, within days.  (Tr. 339).  Dr. Pella further stated that it was less likely at the beginning stages of the condition to require weeks to recover from an attack.  (Tr. 339).

A.      The ALJ Properly Evaluated the Credibility of Plaintiff's Complaints of Pain and Incapacity

In this case, the ALJ found that Plaintiff had severe impairments of gout, osteoarthritis and left ankle degenerative joint disease – post fracture.  (Tr. at 27, Finding 3).  The ALJ further found that, although these conditions prevented Plaintiff from returning to his past work, he retained the physical RFC to perform a full range of sedentary work.  (Tr. at 26).  The ALJ determined that the severity of pain and incapacity alleged by Plaintiff was exaggerated and not credible.  (Tr. at 27, Finding 4).  The ALJ then decided this case adverse to Plaintiff at Step 5 using the grids.  (Id., Finding 10).  In considering the ALJ's decision, it is important to keep in mind that Plaintiff's insured status lapsed on March 31, 2001, and the ALJ was tasked with deciding Plaintiff's entitlement to DIB on or before that date.  (Tr. at 21).

-18-

Plaintiff's primary argument is that the ALJ did not follow <u>Avery</u> in assessing his pain complaints.  In his decision, the ALJ cites to <u>Avery</u> and correctly spells out the applicable six-part pain analysis.  The ALJ then concludes that, "[a]lthough [Plaintiff] clearly has gouty arthritic joint pain and is status/post-left ankle fracture which could reasonably be expected to cause some pain and resulting impairment, the intensity of the pain and the degree of incapacity asserted by [Plaintiff] are found to be inconsistent with the medical evidence of record <u>particularly prior to the lapse of his insured status</u>...."  (Tr. 23).  (emphasis added).  For the reasons discussed below, this Court concludes that the ALJ's finding comports with <u>Avery</u> and is supported by substantial evidence in the record.

The ALJ thoroughly analyzed Plaintiff's statements and the other evidence of record and accurately highlighted the inconsistencies between them. The ALJ noted, for example, that from his alleged onset of disability in December 1997 to the expiration of his insured status in March 2001, Plaintiff sought treatment for gout on only five occasions, and he was treated conservatively with medication. (Tr. 23, Exs. 12F-17F).  At a visit to the emergency room in July 1998, Plaintiff acknowledged that his gout was "getting better," but he wanted medication for his next attack and a "paper to take to court that says I have gout." (Tr. 190).  When Plaintiff returned to the emergency room on April 12, 1999, he stated that it had been nine or ten months since his last flare-up. (Tr. 192).  At an emergency room visit in 2000, it was noted that Indocin had a "good effect" on his condition.  (Tr. 196).  The ALJ also observed that x-rays taken and reviewed by Dr. Khan in June 2003 showed only mild joint space narrowing in the knees.  (Tr. 24, Ex. 10F).

In addition, the ALJ properly noted that the testimony of the medical expert did not support Plaintiff's subjective claims.  Although Plaintiff argues that the ALJ failed to correlate the medical

expert's testimony with his subjective complaints, the ALJ explained in his decision that the testifying medical expert, Dr. Pella, concluded that Plaintiff's gout attacks were infrequent and of shorter duration prior to the expiration of his insured status on March 31, 2001. (Tr. 24, 337-339). In fact, with the exception of noting an antalgic gait, none of Plaintiff's treating or examining sources assessed any functional limitations resulting from Plaintiff's gout. (Tr. 24). Both Dr. Pella's testimony and this medical evidence contravene Plaintiff's claims of constant, disabling pain prior to March 31, 2001.

Plaintiff contends that the ALJ's credibility finding is in error because he did not "give specific reasons for his findings on credibility." (Pl.'s Mem. at 22). Plaintiff is plainly wrong, as the ALJ's decision includes nearly three pages (Tr. 23-25) of detailed analysis of the evidence and specific reasons for his adverse credibility determination. Plaintiff, on the other hand, fails to cite with any specificity the evidence which supports his claims and a review of the record makes clear that the ALJ did not err in finding that Plaintiff's complaints are unsupported by the evidence. As explained above, Plaintiff alleged that his gout subjected him to constant pain and precluded him from standing, walking or climbing, but the medical evidence shows that prior to his date last insured, Plaintiff sought treatment for his condition infrequently, he reported relief with medication and, in 1999, he admitted that it had been nine or ten months since his last flare-up. (Tr. 187-199).

Plaintiff's testimony is also unsupported by the testimony of the medical experts. Dr. Kaplan, an internist and rheumatologist who testified at the December 8, 2003 ALJ hearing, stated that, although Plaintiff seemed to have one attack in 1997, one attack in 1998 and two attacks in 1999, the record did not show any "chronic complaints" until 2002, after the expiration of Plaintiff's insured status. (Tr. 310). While Plaintiff focuses on Dr. Kaplan's statement that episodes of acute

pain may last up to three weeks, he wholly ignores Dr. Kaplan's testimony that in the acute phase, the pain will come and go and likely will not occur every day "until you do have bony changes, which has never been documented, according to the record." (Tr. 312). Plaintiff also ignores Dr. Kaplan's explanation that his sedimentation rate (a measure of inflammation) was "normal" in September 2002, which suggested that "[Plaintiff] was not experiencing a lot of discomfort or inflammation." (Tr. 311).

The testimony of Dr. Pella, an internist who appeared as a medical expert at the May 5, 2005 ALJ hearing, similarly supports the ALJ's decision. For example, Dr. Pella testified that he did not have the sense that Plaintiff's gout attacks were frequent prior to March 31, 2001, his date last insured, and that Plaintiff did not experience marked chronicity until 2002 and 2003. (Tr. 337-338). Dr. Pella explained that not all gout attacks last for weeks, and some resolve fairly quickly, within days. (Tr. 339). Dr. Pella further stated that it was less likely at the beginning stages of gout to require weeks to recover from an attack, as Plaintiff had stated. Id. Nothing in Dr. Pella's testimony supports Plaintiff's allegations of chronic, disabling pain prior to his date last insured.

Next, Plaintiff argues that the ALJ should have deemed his testimony credible because his statements are consistent with previous statements he made to the Agency. Plaintiff's argument is not supported by the record. For instance, at the first 2003 ALJ hearing, Plaintiff testified that, prior to March 2001, he sought treatment at the emergency room "every other month," but at the 2005 hearing, he stated that he only needed treatment "maybe once every six months." (Compare Tr. 288 with Tr. 328). In fact, the medical evidence reveals that prior to his date last insured, Plaintiff sought treatment at the emergency room once in 1997, once in 1998, twice in 1999 and twice in 2000. (Tr. 187-198). Next, Plaintiff testified in 2003 that his pain had progressed over time and was

-21-

not as bad prior to his date last insured of March 31, 2001, but at the 2005 hearing, he claimed that the pain was worse in 2001 than it was at present. (Compare Tr. 300 with Tr. 332).

Similarly, Plaintiff testified at the December 2003 ALJ hearing that the children do all the chores and he typically spends his day watching television and reading the newspaper. (Tr. 296-297). However, he previously reported in January 2002 that he did not require help with chores and that his daily activities included preparing meals, watching the children, washing dishes, dusting, going shopping and walking. (Tr. 122-123, 127). As Plaintiff's statements at the ALJ hearings contradict his previous statements, as well as other evidence of record, the record is supportive of the ALJ's credibility finding.

The assessment of Plaintiff's credibility is a "quintessential" question of fact for "the ALJ who hears the evidence first hand and is in a far better position to make such determinations than a reviewing Court presented with nothing more than a cold record." Suranie v. Sullivan, 787 F. Supp. 287, 291 (D.R.I. 1992). "[T]he ALJ is entitled to consider the consistency and inherent probability of the testimony [and] [w]here there are inconsistencies in the record, the ALJ may discount subjective complaints of pain." Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 194 n.1 (1st Cir. 1987) (citations omitted). Since the ALJ's conclusions are supported by substantial evidence, they are entitled to deference.

**B.     The ALJ's Non-disability Finding is Supported by Substantial Evidence**

Plaintiff's secondary argument is a general attack on the ALJ's non-disability conclusion. Plaintiff argues generally that:

> the ALJ ignores the consistency of the plaintiff's statements at each of his hearings and in his written statements to Social Security, the consistency of the Plaintiff's complaints with respect to his symptoms, the progression of his disease and the side effects of his

> medication with the testimony of both medical experts at his
> hearings, the consistency of the Plaintiff's testimony with his work
> and earnings records contained in the file and ignores the testimony
> of the vocational expert at the Plaintiff's second hearing with respect
> to the impact of absences from the work place with respect to the
> plaintiff's ability to maintain employment.

(Pl.'s Mem. at p. 18).

Plaintiff devotes less than two pages in his brief to this expansive argument. (Id. at pp. 18-19). He only cites to the administrative record in support of one of these arguments and offers no legal support for any of them. His support for these secondary arguments is wholly inadequate. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

As to Plaintiff's arguments that the ALJ did not adequately consider his "statements" and "complaints," those have already been considered and rejected above in connection with Plaintiff's Avery argument. Plaintiff also argues that the ALJ ignored the consistency of his testimony with his wage and earning records. The records indicate that Plaintiff had no reported earnings after 1997. (Tr. 102-107). However, Plaintiff indicated in his benefits application that he "worked all through 98-99-00 [and] last worked 1-15-01." (Tr. 108. See also Tr. 113-114, 128-129, 296-297). When discussing this evidence, the ALJ noted that Plaintiff's testimony was "exceedingly vague" as to his post-1997 work history. (Tr. 21, n.2). The ALJ also discounted Plaintiff's reports of disabling "intense pain" because Plaintiff was able to return to carpentry work during the alleged period of disability and was unwilling or unable to reduce his alcohol consumption to permit the use of a preventative medication. (Tr. 25). The ALJ did not ignore Plaintiff's wage and earnings record. He properly considered it and it supports the ALJ's non-disability finding.

As to the progression of Plaintiff's gout, he neglects to consider the impact of the expiration of his insured status on March 31, 2001.  While there is medical evidence that Plaintiff's untreated gout worsened over time, the ALJ appropriately looked at the medical evidence in the context of Plaintiff's insured period, i.e., prior to March 31, 2001.  As noted above, the ALJ cites to substantial medical and other evidence of record in connection with his conclusion that Plaintiff's "gouty arthritis has been characterized as intermittent and less severe before his insured status expired." (Tr. 24).  The ALJ properly assessed the progression of Plaintiff's gout both before and after March 31, 2001.

Plaintiff also argues that the ALJ did not properly consider the side effects of his medication. The ALJ concluded that "there is no indication in the medical record that [Plaintiff's] medications had caused any significant ongoing side effects prior to the expiration of insured status."  (Tr. 25). Plaintiff does not cite to any supporting medical or other evidence in the record which would call into question the ALJ's finding as to medication side-effects.  Thus, his finding is entitled to deference.

Finally, Plaintiff argues that the ALJ failed to credit the testimony of the vocational expert that no jobs would accommodate his absences from work three or four times a year, each of three weeks' duration.  (Pl.'s Mem. at p. 18).  This contention presumes, however, that there is competent evidence that Plaintiff's gout resulted in such prolonged absences prior to his date last insured.  The medical evidence reveals that Plaintiff's attacks of gout were not frequent prior to March 31, 2001. (Tr. 187-199).  Indeed, the two medical experts testified that Plaintiff's attacks of gout were sporadic and, as Plaintiff was in the early stages of the condition at that time, it is unlikely that he required weeks to recover from these attacks.  (Tr. 307, 310, 312, 336-339).  As the evidence does not

support a finding that Plaintiff's condition resulted in three or four absences per year, each of three weeks' duration, the ALJ was not required to credit the vocational expert's testimony regarding absences from work.

The ALJ's RFC assessment and non-disability finding are supported by substantial evidence. Plaintiff has simply shown no error in the ALJ's decision warranting reversal or remand.

## VI.    CONCLUSION

For the reasons stated above, I order that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Document No. 12) be GRANTED and that Plaintiff's Motion for Summary Judgment (Document No. 10) be DENIED.  Final judgment shall enter in favor of the Commissioner.


   /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
April 23, 2007